UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                            :

| | |
|---|---|
| BERKSHIRE PARTNERS LLC,                : | |
|           Plaintiff,      : | Index No. 08-CV-00556 (GEL) |
|                                : | |
|       -against-       : | **DECLARATION OF** |
|                                : | **JEROME C. KATZ** |
| BALL CORPORATION,           : | |
|           Defendant.   : | |

-------------------------------------------------------------x

        Jerome C. Katz hereby declares as follows:

        1.  I am a partner with Ropes & Gray LLP, attorneys for plaintiff Berkshire Partners LLC ("Berkshire") in this action, and I submit this declaration in support of Berkshire's motion for partial judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

        2.  Attached hereto as Exhibit 1 are true and correct copies of excerpts from the Merger Agreement between the parties dated February 14, 2006.  These excerpts contain all of the Merger Agreement language cited in Berkshire's accompanying memorandum of law.  The full Merger Agreement is attached as Exhibit A to defendant's Answer and Counterclaims.

        3.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

                                                /s/ Jerome C. Katz
                                                   Jerome C. Katz

Dated:  May 19, 2008

# **EXHIBIT 1**

**EXECUTION DRAFT**

AGREEMENT AND PLAN OF MERGER

by and among

BALL CORPORATION,

BALL AEROSOL AND SPECIALTY CONTAINER CORPORATION

and

U.S. CAN CORPORATION

and

THE SECURITYHOLDERS OF U.S. CAN CORPORATION
SET FORTH ON SCHEDULE I HERETO

Dated as of February 14, 2006

553133.07-Chicago Server 2A - MSW

# TABLE OF CONTENTS

Page

ARTICLE I THE TRANSACTIONS ...................................................................... 2
    Section 1.1    The Spin-Off ............................................................... 2
    Section 1.2    The Merger ................................................................. 2
    Section 1.3    Closing ........................................................................ 2
    Section 1.4    Effective Time ............................................................ 2
    Section 1.5    Subsequent Actions .................................................... 2
    Section 1.6    Certificate of Incorporation ...................................... 3
    Section 1.7    The Bylaws ................................................................. 3
    Section 1.8    Directors and Officers .............................................. 3

ARTICLE II EFFECT OF THE MERGER ON CAPITAL STOCK ...................... 3
    Section 2.1    Effect on Capital Stock .............................................. 3
    Section 2.2    Stock Options ............................................................. 4
    Section 2.3    Payment of Merger Consideration ........................... 5
    Section 2.4    No Transfer of Shares After the Effective Time ....... 6
    Section 2.5    Lost Certificates ........................................................ 6
    Section 2.6    No Fractional Shares ................................................. 6
    Section 2.7    Adjustments to Prevent Dilution ............................... 6
    Section 2.8    Certain Adjustments .................................................. 6
    Section 2.9    Tax Consequences ..................................................... 9

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE COMPANY ... 10
    Section 3.1    Organization and Qualification; Subsidiaries ......... 10
    Section 3.2    Charter Documents and Bylaws ................................ 11
    Section 3.3    Capitalization ............................................................ 11
    Section 3.4    Authority Relative to this Agreement ........................ 12
    Section 3.5    No Conflict; Required Filings and Consents ............. 12
    Section 3.6    SEC Filings; Financial Statements ........................... 13
    Section 3.7    Absence of Certain Changes or Events ..................... 15
    Section 3.8    Intellectual Property ................................................. 16
    Section 3.9    Material Contracts .................................................... 17
    Section 3.10   Environmental Matters .............................................. 18
    Section 3.11   Benefit Plans ............................................................. 19
    Section 3.12   Tax Matters ............................................................... 22
    Section 3.13   Litigation .................................................................. 24
    Section 3.14   Brokers ...................................................................... 24
    Section 3.15   Properties and Assets ................................................ 25
    Section 3.16   Compliance with Laws in General ............................ 27
    Section 3.17   Labor Matters ........................................................... 27
    Section 3.18   Required Company Vote ............................................ 28
    Section 3.19   State Takeover Laws .................................................. 28
    Section 3.20   Insurance ................................................................... 28

Section 3.21    Customers and Suppliers ................................................................ 28
Section 3.22    Certain Assets ................................................................................ 28
Section 3.23    Certain Business Practices .............................................................. 29

ARTICLE    IV    REPRESENTATIONS    AND    WARRANTIES    OF    THE
SECURITYHOLDERS ........................................................................................... 29
Section 4.1    Authority Relative to this Agreement .............................................. 29
Section 4.2    No Conflict; No Required Filings or Consents................................ 29
Section 4.3    Title to Securities .......................................................................... 30
Section 4.4    Securities Law Matters. ................................................................. 30

ARTICLE V REPRESENTATIONS AND WARRANTIES OF PARENT AND NEWCO ...... 31
Section 5.1    Organization and Qualification; Subsidiaries .................................. 31
Section 5.2    Charter Documents and Bylaws...................................................... 32
Section 5.3    Authority Relative to this Agreement. ............................................ 32
Section 5.4    Parent Common Stock..................................................................... 32
Section 5.5    No Conflict; Required Filings and Consents. .................................. 32
Section 5.6    Ownership of Newco; No Prior Activities ....................................... 33
Section 5.7    SEC Filings; Financial Statements................................................. 33
Section 5.8    Absence of Certain Changes. ......................................................... 35
Section 5.9    Litigation ....................................................................................... 35
Section 5.10    Brokers ........................................................................................ 35
Section 5.11    Knowledge ................................................................................... 35
Section 5.12    Financing ..................................................................................... 35
Section 5.13    WKSI ........................................................................................... 36

ARTICLE VI COVENANTS............................................................................................ 36
Section 6.1    Interim Operations of the Company................................................ 36
Section 6.2    Filings; Other Action...................................................................... 39
Section 6.3    Access/Confidentiality. .................................................................. 39
Section 6.4    Notification of Certain Matters ...................................................... 40
Section 6.5    Publicity ........................................................................................ 40
Section 6.6    Consents......................................................................................... 40
Section 6.7    Financial Statements ...................................................................... 40
Section 6.8    Parent Financing. ........................................................................... 41
Section 6.9    State Takeover Laws ...................................................................... 42
Section 6.10    Senior Notes................................................................................. 42
Section 6.11    Termination of Affiliate Agreements ............................................ 44
Section 6.12    Tax Covenants. ............................................................................ 44
Section 6.13    Spin-Off....................................................................................... 47
Section 6.14    Shelf Registration Statement ........................................................ 47
Section 6.15    Indemnification by Surviving Corporation..................................... 48
Section 6.16    Transition Services Agreement ..................................................... 50
Section 6.17    Stockholders................................................................................. 50
Section 6.18    Employee Benefits ....................................................................... 50

ARTICLE VII CONDITIONS .......................................................................................... 50

Section 7.1    Conditions to the Obligations of Each Party ............................................. 50
Section 7.2    Conditions to the Obligations of Parent and Newco ............................... 51
Section 7.3    Conditions to the Obligations of the Company ....................................... 52

ARTICLE VIII TERMINATION .................................................................................... 53
Section 8.1    Termination by Mutual Consent ............................................................... 53
Section 8.2    Termination by Either Parent or the Company ....................................... 53
Section 8.3    Termination by Parent ............................................................................... 53
Section 8.4    Termination by the Company .................................................................... 53
Section 8.5    Effect of Termination ................................................................................. 54

ARTICLE IX INDEMNIFICATION ............................................................................... 54
Section 9.1    Survival of Representations, Warranties and Covenants ........................ 54
Section 9.2    Indemnification. .......................................................................................... 55
Section 9.3    Claims for Indemnification. ....................................................................... 56
Section 9.4    Limitations on Indemnification. ................................................................ 57
Section 9.5    Holdback. .................................................................................................... 58
Section 9.6    Exclusive Remedy ....................................................................................... 58
Section 9.7    Adjustment of Merger Consideration ....................................................... 59
Section 9.8    Payments to the Securityholders .............................................................. 59

ARTICLE X APPOINTMENT OF SECURITYHOLDERS' REPRESENTATIVE .................. 59
Section 10.1   Appointment ................................................................................................ 59
Section 10.2   Reliance ....................................................................................................... 60
Section 10.3   Liability ........................................................................................................ 60

ARTICLE XI MISCELLANEOUS; GENERAL .................................................................. 60
Section 11.1   Payment of Expenses. ................................................................................. 60
Section 11.2   Modification or Amendment ...................................................................... 60
Section 11.3   Waiver of Conditions. ................................................................................ 61
Section 11.4   Counterparts ............................................................................................... 61
Section 11.5   Governing Law ............................................................................................ 61
Section 11.6   Notices .......................................................................................................... 61
Section 11.7   Entire Agreement, etc ................................................................................. 62
Section 11.8   Interpretation .............................................................................................. 62
Section 11.9   Certain Definitions ...................................................................................... 62
Section 11.10  No Third Party Beneficiaries ...................................................................... 63
Section 11.11  Specific Enforcement .................................................................................. 63
Section 11.12  Consent to Jurisdiction ............................................................................... 64
Section 11.13  Service of Process ....................................................................................... 64
Section 11.14  WAIVER OF JURY TRIAL ............................................................................ 64
Section 11.15  Severability .................................................................................................. 65
Section 11.16  Company Disclosure Schedule .................................................................... 65

**SCHEDULES**
Schedule I - Securityholders
Schedule 2.8(j) - Subject Receivable

Schedule 7.2(c) - Required Consents

## EXHIBITS

Exhibit A - Spin-Off Agreement
Exhibit B - Form of Escrow Agreement
Exhibit C - Working Capital
Exhibit D - 2005 Unaudited Financials
Exhibit E - Investment Representation Letter
Exhibit F - Debt Commitment Letter
Exhibit G - Form of Non-Competition Agreement
Exhibit H - Company Knowledge
Exhibit I - Parent Knowledge

# GLOSSARY OF DEFINED TERMS

| Defined Term | Position of Definition |
|---|---|
| 5% Stockholder | Section 3.9(d) |
| 2000 Indenture | Section 6.10(b) |
| Adverse Effect | Section 3.15(b) |
| affiliate | Section 11.9(a) |
| Agreement | Preamble |
| Ancillary Agreements | Section 11.9(b) |
| associate | Section 11.9(c) |
| Audited Financial Statements | Section 3.6(c) |
| Benefit Plans | Section 3.11(a) |
| Board | Recitals |
| Business Day | Section 11.9(d) |
| Bylaws | Section 1.7 |
| Certificate | Section 2.3(c) |
| Certificate of Merger | Section 1.4 |
| Charter | Section 1.6 |
| Claim | Section 6.15(a) |
| Closing | Section 1.3 |
| Closing Balance Sheet | Section 2.8(b) |
| Closing Date | Section 1.3 |
| COBRA | Section 3.11(e) |
| Code | Recitals |
| Collection Period | Section 2.8(j) |
| Company | Preamble |
| Company Common Stock | Section 2.1(a) |
| Company Disclosure Schedule | Article III |
| Company Material Adverse Effect | Section 3.1 |
| Company Parties | Section 6.15(a) |
| Company SEC Reports | Section 3.6(a) |
| Company Shares | Section 2.1(a) |
| Company Subsidiary | Section 3.1 |
| Confidentiality Agreement | Section 6.3(b) |
| Corporation | Section 1.6 |
| Current Premium | Section 6.15(c) |
| Debt Commitment Letter | Section 5.12 |
| Debt Offer | Section 6.10(a) |
| Debt Offer Documents | Section 6.10(a) |
| Deductible | Section 9.4(a) |
| DGCL | Section 1.2 |
| D&O Insurance | Section 6.15(c) |
| Effective Time | Section 1.4 |
| Environmental Law | Section 3.10 |
| ERISA | Section 3.11(a) |
| ERISA Affiliate | Section 3.11(a) |

| Defined Term | Position of Definition |
|---|---|
| Escrow Agent | Section 2.3(a) |
| Escrow Agreement | Section 2.3(a) |
| Estimated Balance Sheet | Section 2.8(a) |
| Estimated Working Capital | Section 2.8(g) |
| Estimated Net Debt | Section 2.8(e) |
| Exchange Act | Section 3.5(b) |
| Expenses | Section 11.1(a) |
| Final Closing Balance Sheet | Section 2.8(c) |
| Financing | Section 6.8(a) |
| Foregone NOLs | Section 6.12(e) |
| Formametal | Section 3.1 |
| GAAP | Section 3.6(b) |
| Governmental Authority | Section 3.5(b) |
| Held Back Consideration | Section 2.3(a) |
| Hold Back Period | Section 9.5(a) |
| Indemnified Party | Section 9.3(a) |
| Indemnifying Party | Section 9.3(a) |
| Indentures | Section 6.10(b) |
| Intellectual Property | Section 3.8 |
| knowledge | Section 11.9(e) |
| Laws | Section 3.5(a) |
| Lenders | Section 5.12 |
| Liens | Section 3.5(a) |
| Losses | Section 9.2(a) |
| Lost Tax Benefit | Section 6.12(e) |
| Material Contracts | Section 3.9(b) |
| Maximum Net Debt Amount | Section 2.8(e) |
| Merger | Recitals |
| Merger Consideration | Section 2.1(b) |
| Multiemployer Pension Plans | Section 3.11(a) |
| Net Debt | Section 2.8(f) |
| Net Debt Excess Amount | Section 2.8(f) |
| Net Debt Shortfall Amount | Section 2.8(f) |
| Neutral Auditor | Section 2.8(d) |
| Newco | Preamble |
| Newco Common Stock | Section 2.1(d) |
| Notes | Section 6.10(a) |
| NYSE | Section 5.5(b) |
| Option Date | Section 2.8(j) |
| Option Plans | Section 2.2(a) |
| Options | Section 2.2(a) |
| Order | Section 7.1(a) |
| Parent | Preamble |
| Parent Common Stock | Section 2.1(b) |

| Defined Term | Position of Definition |
|---|---|
| Parent SEC Report | Section 5.7(a) |
| Parent Subsidiary | Section 5.7(d) |
| Payment Shortfall | Section 9.5(b) |
| Pension Plans | Section 3.11(a) |
| person | Section 11.9(f) |
| Permitted Exceptions | Section 3.15(b) |
| Pre-Closing Activities | Section 6.12(e) |
| Pre-Closing Tax Period | Section 6.12(e) |
| Preferred Share | Section 2.1(b) |
| Preferred Stock | Section 2.1(b) |
| Purchase Price | Section 2.3(a) |
| Purchase Price Adjustment Amount | Section 9.5(b) |
| Purchaser Indemnified Parties | Section 9.2(a) |
| Purchaser Material Adverse Effect | Section 5.1 |
| Refinancing | Section 5.12 |
| Representatives | Section 6.3(a) |
| Required Working Capital Amount | Section 2.8(g) |
| Resolution Period | Section 2.8(c) |
| SEC | Section 3.6(a) |
| Secured Notes | Section 6.10(a) |
| Securities Act | Section 3.6(a) |
| Securityholders | Recitals |
| Securityholders' Representative | Section 10.1(a) |
| Seller Indemnified Parties | Section 9.2(c) |
| Senior Secured Financing | Section 5.12 |
| Share Price | Section 2.3(a) |
| Shelf Registration Statement | Section 6.14 |
| SOX | Section 3.6(d) |
| Spin-Off | Recitals |
| Spin-Off Agreement | Recitals |
| Spun-Off Entity | Section 11.9(h) |
| Stockholders Agreement | Section 3.18 |
| Straddle Period | Section 6.12(a) |
| Subject Receivable | Section 2.8(j) |
| Subordinated Notes | Section 6.10(a) |
| subsidiary | Section 11.9(g) |
| Surviving Corporation | Section 1.2 |
| Surviving Corporation Common Stock | Section 2.1(d) |
| Tax | Section 3.12(m) |
| Tax Contest | Section 6.12(g) |
| Tax Return | Section 3.12(m) |
| Third Party Claim | Section 9.3(b) |
| Title Commitments | Section 3.15(b) |
| Title Company | Section 3.15(b) |

| Defined Term | Position of Definition |
|---|---|
| Transaction Documents | Section 11.9(i) |
| Transactions | Recitals |
| Transfer Taxes | Section 6.12(c) |
| Transferred Subsidiary | Section 3.1 |
| Transition Services Agreement | Section 6.16 |
| USC Europe | Recitals |
| USC May | Recitals |
| USCC | Recitals |
| WKSI | Section 5.13 |
| Working Capital | Section 2.8(h) |
| Working Capital Excess | Section 2.8(h) |
| Working Capital Shortfall | Section 2.8(h) |

## AGREEMENT AND PLAN OF MERGER

AGREEMENT AND PLAN OF MERGER (hereinafter called this "Agreement"), dated as of February 14, 2006, by and among Ball Corporation, an Indiana Corporation ("Parent"), Ball Aerosol and Specialty Container Corporation, a Delaware corporation and wholly-owned subsidiary of Parent ("Newco"), U.S. Can Corporation, a Delaware corporation (the "Company") and each of the persons listed on Schedule I hereto.

## RECITALS

WHEREAS, the Company desires that Newco merge with and into the Company, all upon the terms and subject to the conditions of this Agreement (the "Merger");

WHEREAS, the Board of Directors of the Company (the "Board"), subject to the terms and conditions set forth herein, has unanimously (i) determined that the Merger is advisable and in the best interests of the Company and its stockholders, (ii) approved and adopted this Agreement, the Merger and the other transactions contemplated hereby (collectively, the "Transactions") and (iii) recommended approval and adoption by the stockholders of the Company of this Agreement and the Transactions;

WHEREAS, the persons listed on Schedule I hereto are the record and beneficial owners of (i) all of the issued and outstanding shares of preferred stock of the Company and (ii) all of the outstanding shares of restricted stock of the Company (collectively, the "Securityholders"), in each case in the respective amounts set forth opposite their names on Schedule I hereto;

WHEREAS, pursuant to the Merger, all of the shares of the Company's capital stock will be converted in the manner set forth herein;

WHEREAS, for federal income tax purposes, it is intended that the Merger shall qualify as a "reorganization," and this Agreement shall constitute a plan of reorganization, within the meaning of Section 368(a) of the Internal Revenue Code of 1986, as amended (the "Code") and the Treasury Regulations promulgated thereunder;

WHEREAS, prior to the Closing, the Company will enter into a Master Separation and Distribution Agreement with United States Can Company, a wholly owned subsidiary of the Company ("USCC"), U.S.C. Europe N.V., a wholly owned subsidiary of USCC ("USC Europe"), U.S.C. Europe Netherlands B.V., a wholly owned subsidiary of USC Europe, and USC May Verpackungen Holding Inc., a wholly owned subsidiary of USCC ("USC May") in the form of Exhibit A attached hereto (the "Spin-Off Agreement"); and

WHEREAS, the Merger will occur only after, and is conditioned upon the consummation of, the Spin-Off (as defined in the Spin-Off Agreement).

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants, agreements and conditions herein contained, the parties hereto agree as follows:

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to Newco and Parent that, except as set forth on the corresponding section of the disclosure schedule delivered by the Company to Parent and Newco prior to execution of this Agreement (the "Company Disclosure Schedule") and except as disclosed in the Company SEC Reports filed after January 1, 2005 and prior to the date of this Agreement to the extent such qualifications are reasonably apparent (and which in no event shall include any information included in or provided as part of any risk factors or other factors in general cautionary statements, including statements regarding reliance on forward looking statements):

Section 3.1    Organization and Qualification; Subsidiaries.    The Company, Formametal SA ("Formametal") and each subsidiary of the Company (other than the Spun Off Entities, as defined below) (each, a "Transferred Subsidiary") is a corporation or limited liability company, as the case may be, duly incorporated or formed, as the case may be, validly existing and in good standing or its equivalent under the laws of the jurisdiction of its incorporation or formation, as the case may be, and has the requisite power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted except where the failure to be in good standing or its equivalent has not had or would not have, individually or in the aggregate, a Company Material Adverse Effect (as defined below).  The Company and each Transferred Subsidiary is duly qualified or licensed as a foreign corporation or limited liability company, as the case may be, to do business, and is in good standing, in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of its business makes such qualification or licensing necessary, except for any such failure to be so qualified or licensed or in good standing that has not had or would not have, individually or in the aggregate, a Company Material Adverse Effect.  The term "Company Material Adverse Effect" shall mean any change, effect or circumstance that is materially adverse to the business, operations, assets and liabilities (taken together), financial condition or results of operations of the Company and the Transferred Subsidiaries, taken as a whole, or that materially and adversely affects the ability of the Company to perform its obligations under this Agreement and consummate the Transactions; provided, however, that none of the following shall be deemed in themselves (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been a Company Material Adverse Effect:  (i) any change, effect or circumstance that arises out of or relates to a general deterioration in the economy or in the industries in which the Company or the Transferred Subsidiaries operate (except to the extent that those changes have a disproportionate effect on the Company or the Transferred Subsidiaries, taken as a whole, relative to other participants in such industry), (ii) any change, effect or circumstance that arises out of or relates to the declaration by the United States of a national emergency or war, (iii) any change, effect or circumstance that arises out of or relates to (x) the fact that Parent is the prospective acquirer of the Company or (y) the consummation of the Transactions, (iv) any change, effect or circumstance that arises out of or relates to any unilateral action taken by Parent, Newco or any of its affiliates not contemplated by this Agreement or the transactions described herein and (v) any change, effect, event, occurrence, state of facts or development that arises out of or relates to any change in accounting requirements or principles imposed upon the Company or the Transferred Subsidiaries or any

change in applicable Laws or the interpretation thereof (except to the extent that those changes have a disproportionate effect on the Company or the Transferred Subsidiaries, taken as a whole); provided further, however, that in the case of the exceptions contained in clauses (iii) nor (iv), such change, event or circumstance must be directly and demonstrably caused by the particular circumstance described therein.  Section 3.1 of the Company Disclosure Schedule sets forth a complete and accurate list of all subsidiaries of the Company (the "Company Subsidiaries"). Except as set forth in Section 3.1 of the Company Disclosure Schedule, the Company owns directly or indirectly all of the issued and outstanding shares of capital stock of, or other equity interests in, the Transferred Subsidiaries. Other than as set forth in Section 3.1 of the Company Disclosure Schedule, the Company has no other equity interest or profit participation in any entity. No Company Shares are held by a Company Subsidiary.

Section 3.2    Charter Documents and Bylaws.    The Company has heretofore provided to Parent a complete and correct copy of the restated certificate of incorporation and the bylaws of the Company as now in effect.  The restated certificate of incorporation and bylaws of the Company so provided are each in full force and effect. The Company is not in violation of any of the provisions of its restated certificate of incorporation or bylaws.

Section 3.3    Capitalization.

(a)    The authorized capital stock of the Company consists of (i) 100,000 shares of Company Common Stock and (ii) 200,000 shares of Preferred Stock, of which 106,666.667 shares have been designated Series A Senior Preferred and 22,125 shares have been designated Series B Senior Preferred. As of the date of this Agreement, (i) 55,019 shares of Company Common Stock were issued and outstanding, and no shares of Company Common Stock are held in treasury and (ii) 127,220 shares of Preferred Stock were issued and outstanding, consisting of 106,667 issued and outstanding shares of Series A Senior Preferred and 20,553 issued and outstanding shares of Series B Senior Preferred and no shares of Preferred Stock are held in treasury. All issued and outstanding shares of capital stock of the Company are validly issued, fully paid, nonassessable and free of preemptive rights.  Section 3.3(a) of the Company Disclosure Schedule sets forth a complete and accurate list of all holders of capital stock of the Company, indicating the number of shares of each class and series of capital stock of the Company held by each holder. Section 3.3(a) of the Company Disclosure Schedule sets forth the name of each holder of an Option or of a share of restricted Company Common Stock or Preferred Stock or an Award (as defined in the Company's 2005 Equity Incentive Plan), together with the grant date, vesting schedule, exercise price and number of shares of Common Stock or Preferred Stock or other securities subject to each such Option or Award.  Except as set forth above, there are not now, nor (except as expressly permitted by this Agreement) will there be at the Effective Time, any options, warrants, calls, subscriptions or other rights, agreements, arrangements or commitments of any character relating to the issued or unissued capital stock of the Company or any Transferred Subsidiary or obligating the Company or any Transferred Subsidiary to issue, reserve for issuance or sell any shares of capital stock of, or other equity interests in, the Company or any Transferred Subsidiary. There are not now, nor will there be at the Effective Time, any outstanding or authorized stock appreciation rights, phantom stock, profit participation or similar rights with respect to the Company or any Transferred Subsidiary. Except as contemplated hereby, there are no outstanding contractual obligations of the Company

Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC, and that all such information is accumulated and communicated to Parent's management as appropriate to allow timely decisions regarding required disclosure and to make the certifications of the chief executive officer and chief financial officer of Parent required under the Exchange Act with respect to such reports.

(g)    Since January 1, 2003, Parent has not received any oral or written notification of a (x) significant deficiency or (y) material weakness in Parent's internal control over financial reporting.

Section 5.8    <u>Absence of Certain Changes</u>.    From September 30, 2005 to the date hereof, except as contemplated or permitted by this Agreement or the Transactions or as disclosed in any Parent SEC Report filed since September 30, 2005 and prior to the execution and delivery of this Agreement, there has not been any event, change or circumstance that has had or would have, individually or in the aggregate, a Parent Material Adverse Effect.

Section 5.9    <u>Litigation</u>.    There is no suit, claim, action, proceeding or investigation pending, or, to the knowledge of Parent or Newco, threatened against Parent or Newco, at law or in equity, other than suits, claims, actions, proceedings or investigations that, individually or in the aggregate, have not had or would not reasonably be expected to have a Parent Material Adverse Effect. Neither Parent nor Newco is subject to any outstanding order, writ, injunction or decree, other than orders, writs, injunctions or decrees that, individually or in the aggregate, have not had or would not reasonably be expected to have a Parent Material Adverse Effect.

Section 5.10    <u>Brokers</u>.    Except for Banc of America Securities LLC, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by, or on behalf of, Parent or Newco.

Section 5.11    <u>Knowledge</u>.    Parent has conducted an independent investigation of the business of the Company and has been furnished with or given adequate access to such information about the business of the Company as it has requested.    In entering into this Agreement, Parent acknowledges that it has relied solely upon the aforementioned investigation and the specific representations, warranties and covenants of the Company and the Securityholders set forth in this Agreement and the Company Disclosure Schedule and in the other documents contemplated hereby.

Section 5.12    <u>Financing</u>.    Attached hereto as <u>Exhibit F</u> are true and complete copies of the executed commitment letter and the term sheet with respect thereto (collectively, the "<u>Debt Commitment Letter</u>") from Deutsche Bank Securities, Inc. and Deutsche Bank AG New York Branch and J.P. Morgan Securities Inc. and J.P. Morgan Chase Bank, N.A. (collectively, the "<u>Lenders</u>") to provide Parent with $500,000,000 in senior secured debt financing (the "<u>Senior Secured Financing</u>") as in effect on the date of this Agreement. The Debt Commitment Letter has been duly and validly authorized, executed and delivered by Parent. As of the date of this Agreement, there are no conditions precedent or other contingencies related to the funding of the full amount of the Senior Secured Financing other than as specifically set forth

and substance reasonably satisfactory to Parent. The Securityholders agree to pay the amount of Premium in excess of $30,000,000.

Section 6.11    Termination of Affiliate Agreements. All agreements between the Company and its affiliates (other than a Transferred Subsidiary), other than agreements listed on Schedule 6.11 or as otherwise provided in the Spin-Off Agreement, shall be terminated as of the Closing Date, and all obligations and liabilities thereunder shall be canceled without payment or any further liability on the part of the Company or any of the Transferred Subsidiaries.

Section 6.12    Tax Covenants.

(a)    The Securityholders shall prepare or cause to be prepared and shall timely file or cause to be filed in a manner consistent with past practice (except as otherwise required by Law) all Tax Returns of the Company and the Company Subsidiaries (whether separate or consolidated, combined, group or unitary Tax Returns that include the Company or any of its subsidiaries) that are required to be filed (with extensions) on or before the Closing Date; provided, however, that the Securityholders shall, to the extent that any such Tax Return relates to the Company or a Transferred Subsidiary, provide Parent with a copy of each such Tax Return at least thirty (30) days prior to the due date thereof to review and comment on the form and substance of such Tax Returns and Parent shall have the right to approve such Tax Returns, which approval shall not be unreasonably withheld. Parent shall prepare or cause to be prepared and shall timely file or cause to be filed all other Tax Returns, including, in a manner consistent with past practice (except as otherwise required by Law) any Tax Returns of the Company or any Transferred Subsidiary for any Tax periods which begin before the Closing Date and end after the Closing Date (the "Straddle Periods"); provided, however, that Parent shall, to the extent that such Tax Return relates to a Straddle Period or to a Tax or a Loss for which the Securityholders are responsible, or otherwise materially affects the Securityholders, provide the Securityholders with a copy of each such Tax Return at least thirty (30) days prior to the due date thereof to review and comment on the form and substance of any such Tax Return and the Securityholders shall have the right to approve such Tax Return, which approval shall not be unreasonably withheld..

(b)    All Tax sharing or similar agreements under which the Company or any Transferred Subsidiary may at any time have an obligation to indemnify for or share the payment of a Tax (other than this Agreement) shall be terminated with respect to the Company and each such Transferred Subsidiary on or prior to the Closing Date, and the Company and each such Transferred Subsidiary shall thereafter be released from any liability thereunder.

(c)    All transfer, documentary, sales, use, stamp, registration or other similar transfer Taxes ("Transfer Taxes") incurred in connection with the Merger shall be borne by the Securityholders.

(d)    All Transfer Taxes incurred in connection with the Spin-Off shall be borne by the Securityholders.

(e)    The Securityholders shall be liable for, and shall indemnify and hold the Purchaser Indemnified Parties harmless against, without duplication, all Losses, Taxes and

Lost Tax Benefits (as defined below) suffered by the Purchaser Indemnified Parties arising out of or as a result of: (i) all Taxes (or the non-payment thereof), other than Transfer Taxes, of the Company and any Company Subsidiary for all Taxable periods ending on or before the Closing Date and the portion through the Closing Date for any Straddle Period ("Pre-Closing Tax Period"); (ii) any breach of any covenant of the Securityholders contained in this Section 6.12; (iii) the inaccuracy of any representation or warranty made by the Company in Section 3.12 (without giving effect to any qualification as to materiality set forth therein); provided, however, that the representation as to the truth, correctness and completeness of the Tax Returns of the Company and the Company Subsidiaries shall not be construed to constitute a representation as to the amount or expiration date of any of the U.S. Federal net operating losses or net operating loss carryforwards of the Company or the Company Subsidiaries except to the extent provided in Section 6.12(e)(viii) below; provided further, that any indemnification for any breaches of the representation in Section 3.12(d) above as to the minimum amount of the Company's and the Transferred Subsidiary's U.S. federal net operating losses and net operating loss carryforwards shall be governed by Section 6.12(e)(viii) below; (iv) the portion of any Transfer Taxes for which the Securityholders are responsible under Sections 6.12(c) and (d); (v) Taxes imposed on the Company or any Company Subsidiary with respect to, or as a result of, any transaction taken pursuant to the Spin-Off Agreement (including any transaction taken in contemplation of, or as a preliminary step for, a transaction taken pursuant to the Spin-Off Agreement); (vi) Taxes, other than Transfer Taxes, payable by the Company or any Company Subsidiary with respect to any Pre-Closing Tax Period by reason of the Company or any Company Subsidiary being severally liable for the Tax of any Person pursuant to Treas. Reg. Section 1.1502-6 or any analogous state, local or foreign Tax Law; (vii) any amount required to be paid by the Companies under an indemnification agreement (other than this Agreement) or on a transferee liability theory, in respect of any Taxes of any person, which indemnification agreement or application of transferee liability theory relates to an acquisition, disposition or similar transaction occurring on or prior to the Closing Date or a contract entered into on or prior to the Closing Date; and (viii) the lost tax benefit ("Lost Tax Benefit") due to the reduction in the Company's or any Transferred Subsidiary's U.S. Federal net operating loss carryforwards either as a result of (a) any transactions taken pursuant to the Spin-Off Agreement (including any transaction taken in contemplation of, or as a preliminary step for, a transaction taken pursuant to the Spin-Off Agreement), but only to the extent that such reduction in the Company's or any Transferred Subsidiary's U.S. Federal net operating loss carryforwards is not attributable to $31 million of such loss being reduced as a result of gain recognized under Section 987 of the Code or such loss being characterized as a "dual consolidated loss" under Section 1503 of the Code or (b) any pre-Closing transaction, pre-Closing tax position or other pre-Closing activity (collectively, "Pre-Closing Activities") but only to the extent that such Pre-Closing Activities individually or in the aggregate cause the aggregate amount of the U.S. federal net operating losses and net operating loss carryforwards of the Company and the Transferred Subsidiaries to be less than $70 million (collectively with (a), "Foregone NOLs"), which such Lost Tax Benefit shall be equal to the present value of an amount equal to the product of (x) the Foregone NOLs multiplied by (y) 39%, assuming in such present value calculation that the Foregone NOLs would not have been used until the fifth anniversary of the Closing Date and that the discount rate is equal to nine percent (9%); provided, however, that the Securityholders will be liable for Taxes pursuant to clauses (i) through (viii) above only to the extent such Taxes exceed the amount, if any, of Taxes taken into account in the calculation of Working Capital as finally determined pursuant to

Section 2.8 or to the extent not paid pursuant to another provision of this Section 6.12.  For the avoidance of doubt, the parties agree that the $70 million limitation contained in Sections 3.12(d) and 6.12(e)(viii)(b) do not apply to Section 6.12(e)(viii)(a).

(f)    In the case of any Straddle Period, the amount of any Taxes of the Company or any Company Subsidiary based upon or measured by net income or receipts for the Pre-Closing Period will be calculated as though the taxable year of the Company and the Company Subsidiaries terminated as of the end of the day on the Closing Date; provided, however, that in the case of a Tax of the Company or the Company Subsidiaries for a Straddle Period not based on net income or receipts, the amount of Tax for the Pre-Closing Period shall be deemed to equal the amount of Tax for the Taxable period multiplied by a fraction, the numerator of which shall be the number of days from the beginning of the Straddle Period through the Closing Date and the denominator of which shall be the number of days in the Straddle Period.  For Tax Returns relating to the Straddle Periods, the Securityholders shall pay to the Parent within fifteen (15) days before the date on which such Taxes are to be paid the portion of such Taxes which relates to the portion of such Taxable period ending on the Closing Date, as shown on the Tax Returns prepared by Parent in accordance with Section 6.12(a).

(g)    After the Closing Date, each party hereto shall promptly notify any other party in writing of any demand, claim or notice of any pending or threatened Tax audit, investigation, assessment or proceeding (a "Tax Contest") received by such party from any Governmental Authority with respect to Taxes or Lost Tax Benefits for which such other party is liable pursuant to this Agreement or otherwise.  In the case of a Tax Contest after the Closing Date that relates exclusively to a Taxable period ending on or before the Closing Date, the Securityholders shall have the right, but not the obligation, to control (at their own expense) any resulting proceedings and to determine whether and when to settle, compromise and/or concede all or any portion of such Tax Contest; provided, however, that (i) the Securityholders shall have acknowledged that they are liable to the Purchaser Indemnified Parties for such Taxes or Lost Tax Benefits under this Section 6.12.  If Parent so elects, it may override the election of the Securityholders to control the prosecution and defense of such Tax Contest, in which case the Purchaser Indemnified Parties shall be deemed to have waived their rights to indemnification under this Agreement for any Taxes, Lost Tax Benefits or Losses relating to, arising out of, or resulting from such Tax Contest.  The Surviving Corporation shall control any Tax Contests that do not relate exclusively to a Taxable period ending on or prior to the Closing Date; provided, however, that the Securityholders may participate (at their own expense) in any Tax Contest relating to Taxes for Pre-Closing Tax Periods or to Taxes or Lost Tax Benefits for which the Securityholders are or may be otherwise liable under this Agreement, and the Surviving Corporation shall not settle, compromise and/or concede all or any relevant portion of such Tax Contest without the prior written consent of the Securityholders, which consent shall not be unreasonably withheld, unless the Purchaser Indemnified Parties have waived their rights to indemnification under this Agreement for any and all Taxes, Lost Tax Benefits and/or Losses relating to, arising out of or resulting from such Tax Contest.

(h)    Parent and the Securityholders shall cooperate fully with each other and with each party's accounting firms and legal counsel, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns pursuant to this Section 6.12 and any audit, litigation or other proceeding with respect to Taxes or Lost Tax Benefits or

pertaining to the Transactions. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such filing, audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

(i)     The provisions in this Section 6.12, and not the provisions in Section 9.2(a) or 9.2(b) (Indemnification) or Section 9.3(b) (Claims for Indemnification), shall govern with respect to indemnification claims pertaining to Taxes or Losses attributable to Taxes for which the Securityholders are or may be liable under this Agreement; provided, however, that for the avoidance of doubt, the parties' obligations and rights pursuant to this Section 6.12 shall be subject to the limitations and procedures set forth in Section 9.4 (Limitation on Indemnification), Section 9.5 (Held Back Consideration), Section 9.6 (Exclusive Remedy), Section 9.7 (Adjustment of Merger Consideration), and Section 9.8 (Payments to Securityholders) and the provision of Section 9.4(c) shall govern with respect to indemnification claims pertaining to Taxes or Losses relating to Taxes for which Parent and Newco are or may be liable under this Agreement, including this Section 6.12; provided, however, that indemnification claims pursuant to Section 6.12(e)(viii)(a) shall not be subject to Section 9.4(a)(i). The obligations of the Parties pursuant to this Section 6.12 shall survive until ninety (90) days after the expiration of the applicable statute of limitations (for the avoidance of doubt, the applicable statute of limitations for net operating loss carryforwards shall be the statute of limitations for the tax year in which the loss is utilized).

(j)     Parent and each of the Securityholders agree to treat any payments under this Section 6.12 as an adjustment to the Merger Consideration for all Tax purposes.

(k)     To the extent consistent with applicable law, each of the parties hereto shall cooperate with the other parties and shall take all commercially reasonable actions as may be necessary to qualify the Merger, and shall not take any action that would cause the Merger to fail to qualify as a "reorganization" within the meaning of Section 368(a) of the Code.

Section 6.13    Spin-Off.

(a)     The Company shall use its reasonable best efforts to satisfy the conditions to the Spin-Off set forth in Article 6 of the Spin-Off Agreement and shall effect the Spin-Off if such conditions have been satisfied. The Company shall cause each person that is a party to the Spin-Off Agreement to comply with its obligations under the Spin-Off Agreement.

(b)     The Company shall keep Parent informed on a regular basis concerning the developments in the transactions contemplated by the Spin-Off Agreement and the means by which such transactions are effected and, subject to any existing agreements as to the means of effecting the transactions that are reflected in the Spin-Off Agreement, the Company shall give reasonable consideration to Parent's views on the means by which such transactions are effected.

Section 6.14    Shelf Registration Statement. On or prior to the Closing Date, Parent shall file a shelf registration statement (the "Shelf Registration Statement") to register the

(b) <u>Debt Offer</u>. Each of the conditions to the Debt Offer set forth in the Debt Offer Documents (other than that the Merger shall have been consummated) shall have been satisfied or waived.

(c) <u>Spin-Off</u>. The Spin-Off shall have been consummated in accordance with the terms and subject to the conditions set forth in the Spin-Off Agreement.

(d) <u>Ancillary Agreements</u>. The Ancillary Agreements shall have been executed and delivered.

Section 7.2    <u>Conditions to the Obligations of Parent and Newco</u>.    The obligations of Parent and Newco to consummate the Merger are subject to the satisfaction of the following additional conditions, unless waived by Parent in writing:

(a) <u>Representations and Warranties of Company</u>. The representations and warranties of the Company contained in this Agreement shall be true and correct (without giving effect to any limitation on any representation or warranty given by the words "Company Material Adverse Effect", "in all material respects", "material" or "materially"), in each case as of the date of this Agreement and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date, except for such breaches or inaccuracies that have not had or would not have, individually or in the aggregate, a Company Material Adverse Effect.

(b) <u>Covenants and Agreements</u>. The Company shall have performed all obligations and complied with all agreements and covenants of the Company to be performed or complied with by it under this Agreement prior to the Closing Date in each case in all material respects.

(c) <u>Consents</u>. The Company shall have obtained all consents and approvals from Governmental Authorities necessary or required for the consummation of the Transactions the absence of which would have, individually or in the aggregate, a Company Material Adverse Effect and all consents and approvals from the third parties identified on Schedule 7.2(c) attached hereto, all on terms and conditions reasonably satisfactory to Parent.

(d) <u>Litigation</u>. There shall not be pending any suit, action or proceeding by any Governmental Authority or private party that has had or would reasonably be expected to have a Company Material Adverse Effect.

(e) <u>Officers' Certificate</u>. At the Closing, the Company shall deliver an Officers' Certificate, duly executed by the Company's Chief Executive Officer and Chief Financial Officer, stating that the conditions to Closing set forth in Sections 7.2(a) through (d) above have been satisfied.

(f) <u>Certain Events</u>. The conditions set forth in the Debt Commitment Letter shall have been satisfied or waived; <u>provided</u>, that prior to invoking this condition, Parent shall have complied with its obligations under Section 6.8(c) hereof.

(g)    <u>Certified Copies</u>. At the Closing, the Company shall deliver certified copies of (i) the resolutions duly adopted by the Board authorizing the execution, delivery and performance of this Agreement and the other agreements contemplated hereby applicable to it and the Transactions, (ii) documents evidencing compliance with the provisions of Section 6.17 and (iii) the restated certificate of incorporation and the bylaws of the Company.

(h)    <u>Resignations</u>. At the Closing, the Company shall deliver signed letters of resignation from each director of the Company pursuant to which each such director resigns from his position as a director of the Company and makes such resignation effective at or prior to the Effective Time.

(i)    <u>Non-Competition Agreements</u>.  At the Closing, the Company shall deliver, or cause to be delivered, a non-competition agreement duly executed by Berkshire Partners LLC and USC Europe, in substantially the form of <u>Exhibit G</u> attached hereto.

(j)    <u>Certification</u>.   The Company shall have furnished to Parent a certification in accordance with Treas. Reg. § 1.1445-2(c), and otherwise in form and substance reasonably satisfactory to Parent, certifying that an interest in the Company is not a United States real property interest (as defined in Section 897(c)(1)(A) of the Code) because the Company is not and has not been a United States real property holding corporation (as defined in Section 897(c)(2) of the Code) during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(k)    <u>Representations and Warranties of Securityholders</u>.    The representations and warranties of the Securityholders contained in this Agreement that are qualified as to materiality shall be true and correct, and the representations and warranties of the Securityholders contained in this Agreement that are not so qualified shall be true and correct in all material respects, in each case as of the date of this Agreement and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date.  Parent shall have received a certificate signed by or on behalf of each Securityholder to such effect.

Section 7.3    <u>Conditions to the Obligations of the Company</u>. The obligations of the Company to consummate the Merger are subject to the satisfaction of the following additional conditions, unless waived by the Company in writing:

(a)    <u>Representations and Warranties</u>. The representations and warranties of the Parent contained in this Agreement shall be true and correct (without giving effect to any limitation on any representation or warranty given by the words "Parent Material Adverse Effect", "in all material respects", "material" or "materially"), in each case as of the date of this Agreement and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date, except for such breaches or inaccuracies that have not had or would not have, individually or in the aggregate, a Parent Material Adverse Effect.

(b)    <u>Covenants and Agreements</u>. Parent and Newco shall have performed all obligations and complied with all agreements and covenants of Parent and Newco to be

performed or complied with by them under this Agreement prior to the Closing Date in each case in all material respects.

      (c)   Officers' Certificate.  At the Closing, Parent and Newco shall have delivered a certificate, duly executed by an executive officer of Parent, stating that the conditions to Closing set forth in Section 7.3(a) and (b) above have been satisfied.

      (d)   Certified Copies.  At the Closing, Parent and Newco shall deliver certified copies of (i) the resolutions duly adopted by Parent and Newco's board of directors authorizing the execution, delivery and performance of this Agreement and the other agreements contemplated hereby applicable to them and the Transactions, (ii) the resolutions duly adopted by Newco's stockholder approving this Agreement and the Transactions, and (iii) the certificate of incorporation and the bylaws of Parent and Newco.

## ARTICLE VIII

## TERMINATION

      Section 8.1   Termination by Mutual Consent.  This Agreement may be terminated and the Merger and the other Transactions may be abandoned at any time prior to the Effective Time, notwithstanding the adoption thereof by the Securityholders, by the mutual written consent of the Company and Parent.

      Section 8.2   Termination by Either Parent or the Company.  This Agreement may be terminated and the Merger and the other Transactions may be abandoned by the Company or Parent if (a) the Merger shall not have been consummated on or before April 12, 2006 or (b) there shall be any Law that makes consummation of the Merger or the Spin-Off illegal or otherwise prohibited or any Order that is final and nonappealable preventing the consummation of the Merger or the Spin-Off; provided, that the right to terminate this Agreement pursuant to this Section 8.2(a) shall not be available to any party that has breached in any material respect its obligations under this Agreement in any manner that shall have proximately contributed to the failure of the Merger to be consummated.

      Section 8.3   Termination by Parent.  This Agreement may be terminated and the Merger and the other Transactions may be abandoned at any time prior to the Effective Time by Parent if prior to the Effective Time there has been a breach of any representation, warranty, covenant or agreement on the part of the Company set forth in this Agreement such that any of the conditions set forth in Section 7.1 or 7.2 would not be satisfied; provided, however, that, (a) if such breach is curable by the Company through the exercise of its reasonable best efforts and for so long as the Company continues to exercise such reasonable best efforts (but in no event longer than twenty (20) days after Parent's written notification to the Company of the occurrence of such breach), Parent may not terminate this Agreement under this Section 8.3 and (b) Parent may not terminate this Agreement under this Section 8.3 if Parent or Newco is then in material breach of any of its covenants or agreements under this Agreement.

      Section 8.4   Termination by the Company.  This Agreement may be terminated and the Merger and the other Transactions may be abandoned at any time prior to the Effective

proceeds actually received by any Indemnified Party in reduction of the related indemnifiable Loss after reduction for any costs or expenses incurred in connection with collecting such proceeds or payments (which the Indemnified Party will use commercially reasonable efforts to collect).

Section 9.5    Holdback.

(a)    The Held Back Consideration will be held and released in accordance with the terms of this Agreement and the Escrow Agreement for a period beginning on the Closing Date and ending on the fifteen (15) month anniversary thereof, subject to extension as provided in the Escrow Agreement with respect to claims that remain subject to dispute at such date (such period, as so extended, the "Hold Back Period") to (i) satisfy the Securityholders' obligations pursuant to Section 2.8 and (ii) indemnify, defend and hold harmless the Purchaser Indemnified Parties from and against any and all Losses in respect of which such Purchaser Indemnified Parties may be indemnified, defended or held harmless under this Article IX or Section 6.12 (Tax Covenants).  The Securityholders shall, and do hereby, pledge and grant to Parent a security interest in the Held Back Consideration.

(b)    Any payments required to be made to Parent, the Surviving Corporation or a Purchaser Indemnified Party pursuant to Section 2.8, Section 6.12 or Section 9.2(a) or (b) during the Hold Back Period shall be made first by resort to the Hold Back Consideration; provided, however, that the aggregate amount of payments, if any, to be made to the Surviving Corporation pursuant to Section 2.8 (collectively, the "Purchase Price Adjustment Amount") by resort to the Hold Back Consideration shall not exceed $3,500,000; provided further, that if the Purchase Price Adjustment Amount exceeds $3,500,000, the amount of such excess shall be a Payment Shortfall (as defined below) payable in accordance with the following sentence; provided further, that if the Purchase Price Adjustment Amount is less than $2,500,000, an amount equal to the amount by which $2,500,000 exceeds the Purchase Price Adjustment Amount shall be released to the Securityholders from the Held Back Consideration.  If the balance of the Hold Back Consideration is insufficient to satisfy the entire amount of any payment to be made to Parent, the Surviving Corporation or a Purchaser Indemnified Party, as applicable (the "Payment Shortfall"), the Securityholders shall be severally liable for such Payment Shortfall and any required payment shall be paid pro rata by each Securityholder, by wire transfer of immediately available funds for credit to the recipient, at a bank account designated by the recipient in writing.

(c)    At the conclusion of the Hold Back Period, any payments required to be paid to a Purchaser Indemnified Party pursuant to section 9.2(a) shall be paid pro rata by each Securityholder, by wire transfer of immediately available funds for credit to the Purchaser Indemnified Party, to a bank account designated by the Purchaser Indemnified Party in writing.

Section 9.6    Exclusive Remedy. Except for remedies that cannot be waived as a matter of Law or as provided in Section 11.11, if the Closing occurs, indemnification pursuant to this Article IX and Section 6.12 will be the exclusive remedy for any breach of this Agreement (including any representation, warranty, covenant and agreement contained in this Agreement), other than in respect of claims based on conduct constituting fraud or intentional misrepresentation.

Section 9.7    Adjustment of Merger Consideration. Each of the parties agrees to treat any payments under this Article IX as an adjustment to the Purchase Price for all Tax purposes.

Section 9.8    Payments to the Securityholders. The Parties hereto agree that any payments made to the Securityholders by Parent and/or Newco pursuant to Section 2.8, Section 6.12 or this Article IX will be in the form of Parent Common Stock rather than cash (other than amounts of cash payable in respect of fractional shares in accordance with Section 2.6).

## ARTICLE X

## APPOINTMENT OF SECURITYHOLDERS' REPRESENTATIVE

Section 10.1    Appointment. By virtue of approval and adoption of this Agreement, each Securityholder hereby constitutes and appoints Berkshire Partners LLC (the "Securityholders' Representative") in connection with and to facilitate the consummation of the Transactions, with full power to act in all respects as the sole, true and lawful agent, proxy and attorney-in-fact, with full power of substitution, in such Securityholder's name, place and stead, and on his/her/its behalf:

(a)    To execute and deliver the Transaction Documents (with such modifications or changes thereto as to which the Securityholders' Representative, in its reasonable discretion, shall have consented to) and to agree to such amendments or modification thereto as the Securityholders' Representative, in its reasonable discretion, may deem necessary or desirable to give effect to the matters set forth in Section 2.8, Article IX (Indemnification) and this Article X;

(b)    To take such action and to execute and deliver such amendments, modifications, modifications, waivers and consents in connection with this Agreement and the other Transaction Documents as the Securityholders' Representative, in its reasonable discretion, may deem necessary or desirable to consummate the Transactions;

(c)    To conduct or cease to conduct, in its sole and absolute discretion, the defense of all claims against any of the Securityholders in connection with this Agreement and all claims against and liabilities of the Securityholders under Article IX, subject to the limiting provisions of Article IX, so long as all of the liabilities apply to such Securityholders severally in accordance with the applicable percentages set forth on Schedule I and to settle all such claims in its sole and absolute discretion on behalf of the undersigned and exercise any and all rights which any of the undersigned is permitted or required to do or exercise pursuant to this Agreement; no such settlement or action shall bind or otherwise affect the rights or obligations of the Securityholders' Representative; and

(d)    To accept in its sole and absolute discretion on behalf of each Securityholder service of process and any notices required to be served on Securityholders.

For the avoidance of doubt, any compromise or settlement of any matter by the Securityholders' Representative hereunder shall be binding on, and fully enforceable against, all Securityholders.

Section 11.3    Waiver of Conditions.

(a)    Any provision of this Agreement may be waived prior to the Effective Time if, and only if, such waiver is in writing and signed by an authorized representative of the party against whom the waiver is to be effective.

(b)    No failure or delay by any party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Section 11.4    Counterparts.    For the convenience of the parties hereto, this Agreement may be executed in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

Section 11.5    Governing Law.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to the principles of conflict of laws thereof.

Section 11.6    Notices.    All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be deemed given: (i) when sent if sent by facsimile, provided that receipt of the fax is promptly confirmed by telephone; (ii) when delivered, if delivered personally to the intended recipient; (iii) three (3) Business Days following sending by registered or certified mail, postage prepaid; and (iv) one (1) Business Day following sending, if sent by overnight delivery via a national courier service providing proof of delivery, and in each case, addressed to a party at the following address for such party (or at such other address for a party as shall be specified in a notice given in accordance with this Section 11.6):

| | |
|---|---|
| If to Newco: | Ball Aerosol and Specialty Container Corporation<br>10 Longs Peak Drive<br>Broomfield, CO 80021<br>Attention: Charles E. Baker<br>Facsimile No.: (303) 460-2691 |
| with a copy to: | Skadden, Arps, Slate, Meagher & Flom LLP<br>333 West Wacker Drive<br>Chicago, IL 60606<br>Attention:    Charles W. Mulaney, Jr.<br>Facsimile No. (312) 407-0411 |
| If to Parent: | Ball Corporation<br>10 Longs Peak Drive<br>Broomfield, CO 80021<br>Attention: Charles E. Baker<br>Facsimile No.: (303) 460-2691 |

with a copy to:              Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Chicago, IL 60606
Attention:    Charles W. Mulaney, Jr.
Facsimile No. (312) 407-0411

If to the Company:        U.S. Can Corporation
c/o Berkshire Partners LLC
One Boston Place
Boston, MA 02108
Attn.: Carl Ferenbach, Managing Director
Fax:   (617) 227-6105

with a copy to:              Ropes & Gray LLP
One International Place
Boston, MA 02110-2624
Attention: David C. Chapin
Facsimile No.: (617) 951-7050

Section 11.7  <u>Entire Agreement, etc</u>.  This Agreement and the agreements referenced herein or expressly contemplated hereby (a) constitute the entire agreement, and supersede all other prior agreements, discussions, negotiations and understandings, both written and oral, among the parties, with respect to the subject matter hereof, (b) shall not be assignable by operation of law or otherwise without the prior written consent of the other parties hereto and any such attempted transfer or assignment without consent shall be null and void and (c) no transfer or assignment by any party shall relieve such party of any of its obligations hereunder. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

Section 11.8  <u>Interpretation</u>.  The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof. References in this Agreement to Articles and Sections are references to Articles and Sections of this Agreement, unless expressly otherwise stated. Whenever the words "include," "includes," or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The definitions in this Agreement are applicable to the singular as well as the plural forms of such terms.

Section 11.9  <u>Certain Definitions</u>.  For purposes of this Agreement, the term:

(a)  "affiliate" and "affiliates" shall mean, as to any specified person, each person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such specified person. For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause

the direction of the management and policies of a person, whether through ownership of voting securities, by contract or otherwise.

(b) "Ancillary Agreements" shall mean the Transition Services Agreement, the Escrow Agreement and the Spin Off Agreement.

(c) "associate" and "associates" shall have the meaning set forth in Rule 12b-2 under the Exchange Act.

(d) "Business Day" shall mean any day that is not a Saturday, a Sunday or any other day on which banks are required or authorized to be closed in New York City, New York.

(e) "knowledge" of any person that is not an individual means, with respect to any matter in question, the actual knowledge of those individuals listed on Exhibit H hereto with respect to the Company and those individuals listed on Exhibit I hereto with respect to Parent.

(f) "person" means any individual or any corporation, partnership, limited liability company or other legal entity.

(g) "subsidiary" of any person means any corporation, partnership, limited liability company or other legal entity of which such person (either alone or through or together with any subsidiary) owns, directly or indirectly, more than 50% of the stock or other equity or beneficial interests, the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such corporation or other legal entity.

(h) "Spun Off Entity" shall have the meaning ascribed to such term in the Spin Off Agreement.

(i) "Transaction Documents" shall mean this Agreement and the Ancillary Agreements.

Section 11.10 No Third Party Beneficiaries. This Agreement is not intended to be for the benefit of, and shall not be enforceable by, any person not a party hereto other than any Purchaser Indemnified Party or Seller Indemnified Party to the extent such Indemnified Party is entitled to indemnification in accordance with the provisions of Article IX or Section 6.12 (Tax Matters).

Section 11.11 Specific Enforcement. The parties agree that irreparable damage would occur and that the parties would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that without posting bond the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in addition to any other remedy to which it might be entitled, at law or in equity. Each party further agrees that, in the event of any action for specific performance in respect of such breach or violation, it will not assert the defense that a remedy of law would be adequate.